## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LINDA BORELLI**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:11cv1535 |
| | ) | **Electronic Filing** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security**, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

March 4, 2013

I. INTRODUCTION

Linda Borelli ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 – 433 ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 9, 11). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

II. PROCEDURAL HISTORY

Plaintiff applied for DIB on August 24, 2009, claiming that she was disabled as of June 1, 2004. (R. at 94 – 100).[1] Her date last insured for DIB purposes was December 31, 2007. (R. at

---

[1] Citations to ECF Nos. 5 – 5-7, the Record, *hereinafter*, "R. at __."

11). At the time of her application, Plaintiff claimed that she was unable to work due to depression, anxiety, and panic attacks. (R. at 107). Plaintiff was initially denied benefits on December 4, 2009. (R. at 35 – 38). A hearing was scheduled for March 17, 2011, and Plaintiff appeared to testify, represented by counsel. (R. at 18 – 32). A vocational expert also testified. (R. at 18 – 32). The Administrative Law Judge ("ALJ") issued his decision denying benefits to Plaintiff on June 8, 2011. (R. at 9 – 17). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on October 19, 2011, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 5).

Plaintiff filed her Complaint in this court on December 5, 2011. (ECF No. 1). Defendant filed his Answer on March 12, 2012. (ECF No. 4). Cross motions for summary judgment followed. (ECF Nos. 9, 11).

### III. STATEMENT OF THE CASE

#### A. General Background

Plaintiff was born on March 11, 1961, and was fifty years of age at the time of her administrative hearing. (R. at 21). She had graduated from high school, and her work history included employment as a sales associate between 1988 and 1998, and as a restaurant cook between 1999 and 2004. (R. at 108, 111). Plaintiff last worked in June 2004. (R. at 107). She was laid off. (R. at 107). Plaintiff lived in a home with her husband, a retired school teacher, and her dependent adult daughter. (R. at 27). Plaintiff also had a son. (R. at 160 – 61).

### B. Psychiatric Treatment History

Plaintiff first began to seek treatment for her alleged impairments in March 2008 with therapist Janice Pope, L.C.S.W. (R. at 164). In an initial Comprehensive Psychiatric Assessment, it is noted that Plaintiff referred herself to Ms. Pope due to feeling "out of control." (R. at 160 – 61). Plaintiff described feeling depressed and overwhelmed to the point of non-functioning. (R. at 160 – 61). She explained to Ms. Pope that she was nervous, could not sleep, was withdrawn, and felt helpless. (R. at 160 – 61). Her special-needs daughter, drug-addicted son, and husband's legal issues, were all situational stressors contributing to her symptoms. (R. at 160 – 61).

Ms. Pope observed that Plaintiff was very nervous and expressed many fears. (R. at 160 – 61). She had difficulty explaining her symptoms, and her speech was noticeably fragmented. (R. at 160 – 61). Plaintiff was visibly trembling and did not make eye contact. (R. at 160 – 61). She did not experience suicidal thoughts. (R. at 160 – 61). At the time, Plaintiff was not on medication, and did not have a medical history of psychiatric treatment. (R. at 160 – 61). Ms. Pope recommended that Plaintiff also seek the help of a psychiatrist for medication. (R. at 160 – 61). Ms. Pope's prognosis for Plaintiff was guarded. (R. at 160 – 61).

The medical record shows that Plaintiff continued treatment with Ms. Pope approximately once or twice per month through November 2009. (R. at 162 – 64). Plaintiff expressed frustration with having to care for a dependent daughter with cerebral palsy and a seizure disorder, and deal with a drug-addicted son. (R. at 162 – 64). Her husband was also involved with personal legal issues. (R. at 162 – 64). Plaintiff was frequently depressed, angry, nervous, and sleepless. (R. at 162 – 64). She saw little improvement with treatment. (R. at 162 – 64).

Plaintiff's primary care physician was Eileen M. Kummant, M.D. Plaintiff was seen by Dr. Kummant on September 16, 2009. (R. at 143). Plaintiff was being evaluated for anxiety. (R. at 143). She was taking prescribed anxiety medication on an as-needed basis when she could not control panic behaviors. (R. at 143). She did not need the medication for routine irritability. (R. at 143). Plaintiff had been experiencing situational stressors such as the recent deaths of a sister-in-law, father-in-law, and best friend. (R. at 143). The death of her best friend was especially difficult, because the friend helped Plaintiff take care of her daughter. (R. at 143). Plaintiff's sleep problems and mood swings had seen some improvement. (R. at 143). Plaintiff was not observed to be in acute distress, she did not exhibit abnormal behavior, and she denied depression and suicidal ideation. (R. at 143).

State agency evaluator Grant W. Croyle, Ph.D. attempted to complete a Psychiatric Review Technique on December 3, 2009. (R. at 169 – 81). Dr. Croyle indicated that there was insufficient evidence on record to suggest that Plaintiff suffered from impairments prior to December 31, 2007. (R. at 169, 181). He did not provide which portions of the record – if any – he reviewed in coming to this conclusion. (R. at 180 – 81).

Plaintiff's psychiatrist, Alison Barnett, M.D., began treating Plaintiff in April 2008. On October 28, 2009, Dr. Barnett completed her first review of Plaintiff's psychiatric conditions and functional abilities. (R. at 153 – 58). Dr. Barnett explained that she had been seeing Plaintiff for treatment once every three months. (R. at 153 – 58). Plaintiff's diagnoses included moderate major depressive disorder, beginning in 2007, panic disorder with agoraphobia, beginning in 2004, and generalized anxiety disorder, beginning in 2007. (R. at 153 – 58). Dr. Barnett believed that Plaintiff had a longstanding history of mental illness, and that Plaintiff presented as very anxious and depressed. (R. at 153 – 58). Her treatment to that point had proven

disappointing. (R. at 153 – 58). Situational stressors included a strained marriage, substance abusing son, and dependent daughter with severe cerebral palsy. (R. at 153 – 58). Plaintiff lived with her husband and two children, at that time. (R. at 153 – 58).

Dr. Barnett observed Plaintiff to be disheveled, to exhibit reduced psychomotor activity, pressured speech, agitated and sad mood, agitated affect, passive suicidal ideation, poor concentration, poor recent memory, poor impulse control, poor judgment, and poor insight. (R. at 153 – 58). She also was fully oriented, had intact remote memory, had average information and intelligence, and demonstrated no evidence of psychosis, hallucinations, or depersonalizations. (R. at 153 – 58). Plaintiff had at least one panic attack per week, even when taking her medications. (R. at 153 – 58). Plaintiff's husband completed household chores, but Plaintiff cared for her personal grooming and hygiene independently. (R. at 153 – 58).

Dr. Barnet felt that Plaintiff had difficulty interacting with and communicating to family, friends, neighbors, co-workers, supervisors, and the general public. (R. at 153 – 58). She did not handle crowds well. (R. at 153 – 58). Her prognosis was poor. (R. at 153 – 58). Plaintiff's specific functional limitations included slight limitation with respect to understanding, remembering, and carrying out simple instructions, but extreme limitation in all other areas of functioning. (R. at 153 – 58).

On October 18, 2010, Dr. Barnett completed a second assessment of Plaintiff's mental state and functional capacity. (R. at 182 – 87). Dr. Barnett stated that Plaintiff had been seen once every three months in the intervening time. (R. at 182 – 87). Plaintiff's diagnoses included childhood attention deficit hyperactivity disorder, moderate major depressive disorder since 2007, panic disorder with agoraphobia since 2004, and generalized anxiety disorder since 2007. (R. at 182 – 87). Dr. Barnett opined that Plaintiff first presented to her with a longstanding

5

history of multiple psychiatric conditions. (R. at 182 – 87). Dr. Barnett felt that Plaintiff had been deteriorating despite treatment. (R. at 182 – 87). Sources of situational stress included an unstable marriage, a substance abusing son, and a dependent daughter with severe cerebral palsy. (R. at 182 – 87). Plaintiff explained to Dr. Barnett that her husband was primarily responsible not only for the care of their daughter, but for most household duties. (R. at 182 – 87).

Dr. Barnett observed Plaintiff to be disheveled, to exhibit at times agitated or retarded behavior and psychomotor activity, and to exhibit pressured speech, elevated mood, agitated expression, poor concentration, passive suicidal ideation, poor recent memory, poor impulse control, and poor judgment. (R. at 182 – 87). Yet, Plaintiff was capable of conversing appropriately, had no hallucinations or depersonalization, had no psychosis, had average intelligence, had full orientation, and had intact remote memory. (R. at 182 – 87). In spite of her medication regimen, Plaintiff suffered at least one panic attack per week. (R. at 182 – 87).

Plaintiff was capable of managing her own benefits, and could also manage her activities of daily living. (R. at 182 – 87). She no longer drove, because a panic attack allegedly caused her to crash the family vehicle. (R. at 182 – 87). Dr. Barnett believed that Plaintiff demonstrated difficulty getting along with and communicating to family, friends, neighbors, co-workers, employers, and the general public. (R. at 182 – 87). Cognitively, she had been declining. (R. at 182 – 87). Plaintiff's symptomology showed little improvement, and Dr. Barnett's prognosis was "grave." (R. at 182 – 87).

In terms of functional limitations, Plaintiff had slight limitation with respect to understanding, remembering, and carrying out simple instructions, and extreme limitation with respect to all other functioning. (R. at 182 – 87). Dr. Barnett felt that Plaintiff had suffered from psychiatric issues prior to her treatment of Plaintiff. (R. at 182 – 87).

On January 26, 2011, Dr. Barnett completed a Mental Status Questionnaire. (R. at 193 – 95). In it, she indicated that while she had only begun to treat Plaintiff in 2008, Plaintiff began experiencing mental health issues in 2004. (R. at 193 – 95). Plaintiff had since been diagnosed with major depressive disorder, severe panic disorder with agoraphobia, and generalized anxiety disorder. (R. at 193 – 95). It was Dr. Barnett's opinion that Plaintiff was totally disabled as a result of her mental impairments, and had made little progress toward improvement during their treatment relationship. (R. at 193 – 95). Plaintiff was also noted to be engaging in therapy with Ms. Pope. (R. at 193 – 95). Plaintiff's responsiveness to Ms. Pope had been minimal, as well. (R. at 193 – 95). Dr. Barnett expressed concern that Plaintiff may have been borderline mentally retarded. (R. at 193 – 95).

In terms of specific functional limitations, Dr. Barnet concluded that Plaintiff would experience marked limitation with respect to activities of daily living, extreme limitation with respect to social functioning, and extreme limitation with respect to concentration, persistence, and pace. (R. at 193 – 95). Additionally, it was noted that Plaintiff was often unable to leave her home. (R. at 193 – 95). She would miss at least ten days of work, per month, if she were to seek employment. (R. at 193 – 95).

Treatment notes with Dr. Barnett spanning April 2008 through November 2010, were similar in nature to those of Ms. Pope. (R. at 196 – 201). Plaintiff was frequently depressed, upset and angry, anxious, and unable to sleep. (R. at 196 – 201). She had difficulties with her children and a controlling husband involved in a personal legal matter. (R. at 196 – 201). Plaintiff saw little improvement with counseling and medication. (R. at 196 – 201).

At an undated visit to Dr. Kummant's office, it was indicated that Plaintiff had been suffering from depression and anxiety since 2001. (R. at 140). She was seeing a psychiatrist,

7

and had been taking prescription medications. (R. at 140). Plaintiff was "doing much better." (R. at 140). Plaintiff wanted to stop her current medication, however. (R. at 140). Dr. Kummant observed that Plaintiff's insight and judgment were normal, she was not disoriented, she had no memory impairment, and her mood and affect were normal. (R. at 141).

On March 1, 2011, Plaintiff's husband completed a personal statement regarding functional limitations he had witnessed. (R. at 136 – 37). Plaintiff was observed to be having difficulty with reading, cooking, cleaning, laundry, driving, and traveling. (R. at 136 – 37). Her husband claimed that he was responsible for most household chores. (R. at 136 – 37). He did not discuss the history or duration of Plaintiff's dysfunction. (R. at 136 – 37).

### C. <u>Administrative Hearing</u>

Plaintiff testified that following the loss of her last job in 2004, she had not attempted to seek further employment. (R. at 22). She partially attributed the loss of her job to her psychological condition. (R. at 25). Plaintiff stated that she had been informing her primary care physician of difficulty with panic, anxiety, and poor sleep, and that her physician referred her to Ms. Pope for therapy. (R. at 24). Ms. Pope then suggested that Plaintiff also see Dr. Barnett for medication management. (R. at 24). Plaintiff thereafter visited Dr. Barnett approximately once every three months beginning in 2008. (R. at 23). Plaintiff stated that she had been taking her prescription medications as advised. (R. at 23).

As for her daily routine, Plaintiff described spending most of her time watching television and sleeping. (R. at 25). She endorsed difficulty with focus and lack of motivation, but she was not tired. (R. at 25 – 26). Plaintiff also experienced crying spells and anger outbursts – trending more towards anger. (R. at 26). Plaintiff had "better and worse" days, and on her worse days she claimed to mostly stay in bed or on her glider watching television. (R. at 26). She would not

8

attend to personal grooming on such days. (R. at 26). She had worse days at least three times per week. (R. at 27).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a person of Plaintiff's age, educational background, and work experience would be capable of performing a significant number of jobs in the national economy if extremely limited with respect to interacting appropriately with the public, co-workers, and supervisors, responding appropriately to changes in a routine work setting, and responding appropriately to pressures in a usual work setting. (R. at 30 – 31). The vocational expert replied that a person so limited would be precluded from finding full-time work. (R. at 31).

## IV. STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler*, 786 F. 2d 581, 583 (3d Cir. 1986).

When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920. The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his

9

past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)2, 1383(c)(3)3; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. See 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart*, 312 F. 3d 113, 118 (3d Cir. 2002).

---

[2] Section 405(g) provides in pertinent part:
> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. When considering a case, a district court cannot conduct a de novo review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting de novo might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

V.  **DISCUSSION**

In his decision, the ALJ concluded that Plaintiff did not provide evidence sufficient to demonstrate disabling impairment prior to, or on, the date last insured for DIB purposes – December 31, 2007. (R. at 11). As a result, Plaintiff was considered ineligible for DIB. (R. at 14). The ALJ's analysis did not proceed beyond Step 2. (R. at 11 – 14).

Plaintiff claims that the ALJ committed error requiring remand by failing to move beyond Step 2 of the five step analysis. (ECF No. 10). Plaintiff further alleges that in so doing,

the ALJ impermissibly ignored the opinion of Dr. Barnett regarding the onset of Plaintiff's mental disorders prior to the date last insured, and ignored the Social Security Administration's mandate under S.S.R. 83-20 that the ALJ consult with a medical expert at the administrative hearing to determine the precise onset date of Plaintiff's impairments. (ECF No. 10 at 6 – 14). Defendant counters that Dr. Barnett's opinions were not entitled to any weight by the ALJ due to a lack of evidence to support her conclusions regarding onset. (ECF No. 12 at 9 – 16). Moreover, the ALJ was allegedly under no duty to consult with a medical expert to determine the exact date of Plaintiff's impairment onset. (*Id.*).

The purpose of an ALJ's analysis at Step 2 is to determine whether or not an alleged impairment is "severe." *Magwood v. Comm'r of Soc. Sec.*, 417 Fed. App'x 130, 132 (3d Cir. 2008) (quoting *Newell v. Comm'r of Soc. Sec.*, 347 F. 3d 541, 546 (3d Cir. 2003)). "Severe" impairment is defined by regulation as "any impairment . . . which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). Impairment is not "severe" where the record demonstrates only "slight abnormality or a combination of slight abnormalities which have 'no more than a minimal effect on an individual's ability to work.'" *Magwood*, 417 Fed. App'x at 132. As such, Step 2 is no more than a "*de minimis* screening device to dispose of groundless claims." *Id.*

Given, then, that the purpose of Step 2 is merely to serve a minimal gate-keeping function, Plaintiff's burden is not an exacting one. *McCrea v. Comm'r of Soc. Sec.*, 370 F. 3d 357, 360 (3d Cir. 2004) (citing S.S.R. 85-28, 1985 WL 56856 at *3). Reasonable doubts regarding the evidence should be construed in the light most favorable to the claimant. *Newell*, 347 F. 3d at 547. Further, the use of Step 2 as a vehicle for the denial of benefits should, "raise a judicial eyebrow," and deserves "close scrutiny." *McCrea*, 370 F. 3d at 360 – 61. Nonetheless,

the court still looks to whether the ALJ provided substantial evidence as justification for his decision – whether he stopped at Step 2 or continued through Step 5. *Kirk v. Comm'r of Soc. Sec.*, 177 Fed. App'x 205, 207 (3d Cir. 2006); *McCartney v. Comm'r of Soc. Sec.*, 2009 WL 1323578 at *13 – 16 (W.D. Pa. May 8, 2009). In the present case, the ALJ's analysis at Step 2 was adequately supported.

The ALJ rejected Plaintiff's allegations of disability at Step 2 of the five-step analysis for a number of reasons. (R. at 11 – 14). The reasons included Plaintiff's failure to seek treatment between her alleged onset date and her date last insured, the lack of evidence that she left her place of former employment due to mental illness, and the lack of opinions by treating medical sources as to the existence of limitations at a disabling level of severity prior to Plaintiff's date last insured. It is Plaintiff's contention that "severe" impairments should have been found at Step 2; yet, Plaintiff failed to provide the ALJ with affirmative evidence regarding the precise degree of her impairment prior to her date last insured.

Dr. Barnett noted on several occasions that Plaintiff's impairments surfaced prior to her date last insured – in 2004 and 2007. However, there was no mention in the notes as to what Plaintiff's level of functioning was prior to Dr. Barnett's care. All of the notes provided to the ALJ thoroughly accounted for Plaintiff's level of functioning after she began treatment in early 2008, but not before. Moreover, the notes from Dr. Barnett, Dr. Kummant, and Ms. Pope do not report totally consistent findings, let alone speak to Plaintiff's degree of limitation prior to her date last insured. Dr. Kummant felt that Plaintiff was doing quite well since beginning her treatment, and Plaintiff had even expressed to Dr. Kummant that she was not experiencing depression. Such evidence hardly paints a clear picture of Plaintiff's functioning even after her date last insured.

Further, while Plaintiff testified that she lost her last job due – at least in part – to her mental illness, the record shows that she was laid off from her last job. Plaintiff never provided a reason to explain why she had failed to seek treatment following that time until 2008. Unlike the case of *Walton v. Halter*, 243 F. 3d 703, 706 – 07 (3d Cir. 2001), Plaintiff's past treatment record was not simply lost, ambiguous, or diminished by the passage of decades; it was non-existent. Here, the record clearly showed that there was no attempt to seek treatment prior to Plaintiff's date last insured.

While the notes of Plaintiff's treating sources indicated that there was evidence of "severe" impairment following Plaintiff's engagement in treatment, Dr. Barnett's statement that Plaintiff's diagnoses of panic disorder with agoraphobia, and major depressive disorder and generalized anxiety disorder, dating back to 2004 and 2007, respectively, was hardly a "retrospective" of the type claimed by Plaintiff. No statements regarding Plaintiff's ability to function prior to her date last insured were made. Even Plaintiff's husband failed to indicate when her disabling conditions began. *See Newell*, 347 F. 3d 541 ("If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation . . . from family members").

As such, the determination by the ALJ that Plaintiff was not experiencing "severe" impairments prior to her date last insured was adequately supported. Further, the lack of evidence demonstrating an onset date for impairment – let alone disabling impairment – left little for the ALJ to discuss, and was not "ambiguity" sufficient to justify expert medical testimony as to the onset date at Plaintiff's hearing. S.S.R. 83-20 advises an ALJ to consult a medical expert when it is difficult to discern onset, not when a lack of evidence makes it impossible. Plaintiff

did not bear her burden of providing evidence of disabling – or "severe" – impairment prior to her date last insured.

## VI. CONCLUSION

Based upon the foregoing, this court finds that the ALJ presented substantial evidence to justify his conclusion that Plaintiff did not have "severe" impairments beginning before her date last insured – December 31, 2007. Accordingly, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted, and the decision of the ALJ is affirmed. Appropriate Orders follow.

s/ David Stewart Cercone<br>
David Stewart Cercone<br>
United States District Judge

cc.    Karl E. Osterhout, Esq.
       Paul Kovac
       Assistant United States Attorney

       (*Via CM/ECF Electronic Mail*)